335 So.2d 466 (1976)
EAST PARKER PROPERTIES, INC.
v.
PELICAN REALTY CO. et al.
No. 10761.
Court of Appeal of Louisiana, First Circuit.
May 24, 1976.
Rehearing Denied July 21, 1976.
Writ Refused October 27, 1976.
*468 E. Drew McKinnis and Martin C. Schroeder, Jr., Baton Rouge, for appellants.
Donald S. Zuber and John W. L. Swanner, Baton Rouge, for plaintiff-appellee.
Before LANDRY, COVINGTON and PONDER, JJ.
PONDER, Judge.
Plaintiff-appellee, East Parker Properties, Inc., (Parker) filed this suit for declaratory judgment against the original developer, Pelican Realty Company, and the Owners of lots in College Town Subdivision located in Baton Rouge, Louisiana, to have certain restrictions declared abandoned, so as to allow construction of an apartment complex on Lots 1 through 9 of Square 7 of that subdivision. Some of the defendants reconvened, averring: that Lot 3 of Square 7 was a servient estate *469 owing a servitude of passage or other "real rights" to a cemetery and a park, both adjacent thereto; that the judgment in Suit No. 105,944 on the docket of the 19th Judicial District Court for the Parish of East Baton Rouge, entitled John S. Garrett and Thomas H. Garrett v. Pelican Realty, et al, "directing that recorded building restrictions in College Town Subdivision. . . shall not prohibit or prevent. . . const[ruction] [of] multiple apartment buildings on Lots 6, 7, 8 and 9 of Square 7," should be declared null because not all owners in the subdivision were joined as defendants; and that all restrictions of College Town are still effective, not having been abandoned.
After trial, the judge below rendered judgment "in favor of plaintiff and defendant-in-reconvention, East Parker Properties, Inc. and against the defendants and plaintiffs-in-reconvention . . . decreeing that the building restrictions in College Town Subdivision have been waived and are null and void, insofar as they would prohibit the construction of apartment houses on Lots 1, 2, 3, 4, 5, 6, 7, 8, 9 of Square 7 . . . and further that the building restrictions . . . as they relate to sideline restrictions, multi-residential use of lots, front and rear setback lines, building lines, garage location restrictions, and any and all other building restrictions are null, void, invalid and not applicable to Lots 1, 2, 3, 4, 5, 6, 7, 8 and 9 of Square 7 . . ." and that the reconventional demand of the various plaintiffs-in-reconvention be dismissed.
Some of the defendants and plaintiffs-inreconvention have timely appealed the judgment of the lower court.[1]
The developer obligated itself to put the following restrictions in all acts of sale:
"(1) The building line of the lot herein described is hereby fixed and shall not be less than thirty (30) feet back from and parallel with the front line of said lot, and no building of any kind shall ever be built nearer to the front of said lot than said thirty (30) feet building line, and no residence or garage shall be placed nearer than fifteen (15) feet to either side line of said lot, and no owner shall ever erect more than one residence on any one lot . . ., provided that when the same person . . . is the owner of more than a whole lot, he . . . may treat the whole property. . . as one lot, and buil[d] accordingly, provided that under no circumstance shall more than one residence be built on any lot or piece of ground less than seventy (70) feet in width; and provided further that the front of no garage when built separate from a residence shall be more than forty (40) feet from the rear line of said lot.
"(2) [The owner shall not] ever use or permit the use of any house or houses erected on said lot or lots . . . either directly or indirectly for business purposes of any description, except Square 1, it being understood that the above described lot or lots are for residential purposes only.

*470 "(3) That the above described lot or lots shall never be transferred by sale or donation or otherwise, or leased, to any negro or colored person or any negro or colored person permitted to occupy the same, except as servants and their immediate families domestic to any white family occupying same."
College Town, in slightly over fifty years, developed into a quaint subdivision, reflecting considerable architectural variety. Most of the 196 lots in the subdivision have been beautifully landscaped with emphasis on flowering plants, such as camellias and azaleas. Many of the residents have recently expended large sums of money refurbishing their homes. One home was recently featured in "Better Homes and Gardens," a national well-known magazine. Several large expensive homes have recently been built.
All witnesses testified that College Town is a nice place to live. It is considered a "professional" neighborhood, inhabited by a large number of college professors, doctors and lawyers. Its location next to campus makes it highly desirable and convenient.

ENTRANCE TO CEMETERY AND LOT
The dispute over the entrance to the cemetery and the park arises from a notation on the early maps of a corridor along the side of Lot 3 of Square 7 from University Boulevard (now East Parker Boulevard) to the cemetery and the park, indicated by a dotted line together with the word "Entrance" printed thereon. Any claim to this entrance has been negated by the appropriate authorities. There was no evidence that the "Entrance" was needed or being used in any manner in connection with the park or the cemetery. Both facilities have adequate access otherwise. The claim that the "Entrance" was a part of the cemetery and therefore inalienable is not supported by any evidence other than inference from the notation on the maps. We find that inconclusive. This portion of the reconventional demand should have been denied by the lower court rather than pretermitted.

THE GARRETT SUIT
On March 24, 1965, John and Thomas Garrett, Parker's predecessor in title, filed suit to have College Town's building restrictions declared null "solely insofar as the restrictions affect Lots 6, 7, 8 and 9, of Square 7 . . .," so as to "permit construction of apartment houses" on these lots. Nellie Mae Coerver, a property owner, was made a defendant. Gerard E. Kiefer, an attorney appointed to represent the non-resident defendants, filed answer for them. Elayn Hunt, who represented a majority of the numerous defendants, also filed an answer on behalf of Nellie Cahill Coerver. However, Mrs. Coerver had died on March 18, 1965, before the suit was filed. On April 20, 1965, Thomas Coerver was made testamentary executor of his mother's estate. On May 3, 1965, Thomas together with three brothers and four sisters were put into possession of their mother's estate, including the house at 4448 Oxford Avenue. The judgment in the Garrett suit was signed on November 23, 1965.
Mr. Kiefer testified that since he had the telephone numbers of both Thomas and Michael Coerver in his file he must have talked to them and advised them of the suit. The lower court held that "since the administrator of the estate had actual knowledged of the litigation, the general appearance by Mr. Kiefer completely cured any irregularities in service or citations." We disagree.
Foregoing any questions as to the scope of Mr. Kiefer's authority to represent the succession and the sufficiency of the proof of communication with Thomas and Michael Coerver, we find the representation ineffective. Actual knowledge of *471 the pendency of suit does not obviate the necessity of citation and service of process. Mrs. Coerver was deceased at the time of the filing of suit; her succession was never made a party; the eight heirs had been put into possession shortly after Mr. Kiefer on April 27, 1965, filed an answer for the "absent defendants" and before the filing of answer by Miss Hunt on June 18, 1965, and months before the signing of the judgment on November 23, 1965. A judgment against a deceased person is a nullity. Gulfco Finance of Livingston, Inc. v. Lee, 224 So.2d 524 (La.App. 1st Cir. 1969). Since neither the administrator, Thomas Coerver, nor any of the heirs, who were the actual owners of the College Town property at the time the Garrett judgment was signed, was served with process and none of them made a general appearance, they are now entitled to judgment decreeing the nullity of the Garrett judgment as it affects them. See C.C.P. Art. 2002.[2]

RESTRICTIONS
Generally, the courts will enforce building restrictions imposed upon land according to the intent of the subdividers, provided they not be against public policy and not be abandoned.
It is not every violation that will lead to abandonment. We must look to the intention of those imposing and those seeking to continue the building restrictions. Insubstantial, technical or infrequent violations, not subversive of the general plan or scheme, are to be given little effect.
In deciding whether or not restrictions have been abandoned, we must first decide what the subdividers intended the plan and scheme of the subdivision to be; then we must inquire into each alleged violation to determine whether the intended plan and scheme are disrupted. It is our conclusion that the restrictions in this case taken as a whole evidence an intent to allow only one family per lot.
Whether there has been acquiesence in violations of subdivision restrictions sufficient to defeat enforcement of the restrictions depends upon the circumstances of each case, including particularly the character, materiality and number of the violations and their proximity to the objecting residents. Guyton v. Yancey, 240 La. 794, 125 So.2d 365 (1960). Generally, where there have been frequent and substantial violations of the restrictions without objection, the restrictions are regarded as having been abandoned. Edwards v. Wiseman, 198 La. 382, 3 So.2d 661 (1941). However, for this rule to be applicable, the property owner against whom abandonment is asserted, must have known of the alleged violations or have had a duty to know.[3] Also, there is no abandonment of subdivision restrictions unless violations have been such that there has been a subversion of the original scheme of the subdividers, resulting in a substantial change in the intended nature of the subdivision. Guyton, supra; Marquess v. Bamburg, La.App., 188 So.2d 721, Adair v. Chrysler, La.App., 212 So.2d 552. See also Plauche v. Albert, La.App., 42 So.2d 876. Melrose Civic Association v. Universal Builders, Inc., 289 So.2d 521 (La.App. 1st Cir. 1973), writ refused, La., 293 So.2d 171 (1974).
The building restriction against the erection of other than a single family residence is modified by the implied approval of living quarters for domestic servants.
*472 Since building restrictions are to be interpreted in favor of the unrestricted use of property, we find that the building of apartments for servants was not a violation. Salerno v. DeLucca, 211 La. 659, 30 So.2d 678 (1948). However, reasonably, because of the lapse of time, there was little evidence or any building for use as servants' quarters. Furthermore, a restriction against the erection of a particular type of building is construed as prohibiting the conversion to that use.[4] Therefore, even if a structure were built for servants' quarters, a conversion to rental use would result in a violation.[5]

MULTI-FAMILY RESTRICTION
Much of the renting in the subdivision occurred in Square 1, located in the extreme western corner of the subdivision.
The restrictions allow business uses in Square 1. Twelve of the lots there are 37 ½ feet by 69 feet in size. The exception as to business use and the illogical effect of the imposition of a 30 foot building setback line and a 15 foot setback line on each side lead us to the conclusion that these restrictions were not intended to be imposed on Square 1.[6] We will therefore disregard any evidence as to "violations" in that square.[7]
[IS] Square 2, in the extreme southwest border of the subdivision, containing eighteen lots, was found to have three violations. Lot 1, owned for investment by a corporation, has been used as two apartments, with two street addresses. Its appearance of a single residence, its location at the edge and on Highland Road, and the absence of general knowledge of its use lead the court to believe that the violation is not subversive and has not been acquiesced in. The owner of Lot 4 admitted to renting rooms but not apartments. The house has the appearance of a single family residence. It is doubtful that there is a violation, but if there be one, it is technical and insubstantial. Neighbors testified that the rental was unknown to them prior to the trial. The proof as to violation on Lot 16 was inconclusive, consisting only of the fact, unexplained, that there were two names in the city directory at this address.
Lots 13 and 14 of Square 3 have two city addresses. The owner testified that his mother-in-law lived in the garage apartment from 1963 to 1974, but that he has never rented it. This violation is technical and insubstantial. Lot 17 evidently was rented out in 1970 and 1971. However, the building appears to be a single family dwelling and only one person testified that he was aware it was being rented. Lot 20 has a violation. Several witnesses testified they knew of the violation; several were unaware. Lot 26 and the SW ½ of Lot 1 has a garage apartment that admittedly has been rented out. Square 3 lies in the southeastern border, fartherest from Square 7, involved in this litigation.
*473 square 4 contains no alleged multi-family violations.
Lot 8, Square 5, contains a violation.
Lot 7, Square 6 has a duplex apartment, admittedly a violation. Lot 9 has a garage apartment that evidently was last rented in 1955; the present owner testified he was not renting it. There was no evidence as to knowledge thereof being widespread.
Square 7 contains the lots involved in this litigation. There was no evidence of any violations.
The owner of Lot 4, Square 8 testified that he lived in the garage apartment while his home was being built. Thereafter it was rented off and on until May, 1973. Some residents knew of the violation; some did not.
The owner of Lot 3, Square 9, built a garage apartment for her son. After he moved out of the state she rented it off and on. Some residents knew of the violation; some did not. Lot 4 has had multi-family occupancy up to 1963. However, a neighbor testified he did not know of any tenants.
There were no alleged violations in Squares 10, 11, 12, 13 and 14. Squares 15 and 16 now contain College Lake.
Evidently, the owner of Lots 9 and 10, Square 17, rented out rooms as late as 1958 and 1959. As above, if the renting of rooms be a violation, it is technical and not subversive of the plan of the subdivision.
The owner of Lots 1 and 2, Square 18, testified that the garage apartment thereon was intended as servant's quarters, but when that proved impractical he rented the quarters during the summer when he was away and needed someone to watch his home.
The owner of Lot 4 admitted renting an apartment in the remote past. City directories indicate tenant occupancy in 1955 only. The only evidence of tenant occupancy on Lot 8 was a city directory listing in 1954. We find this to be insufficient to prove violation, much less acquiescence.
The only proof of tenant occupancy in Lot 2, Square 19, is a city directory listing in 1954. We find this inadequate proof of violation and acquiescence. The owner of Lots 8 and 9 admitted to a guest house that he occasionally rented out. City directories indicate tenant occupancy in 1959, 1961, 1962, 1966, 1968 and 1971.
We find only two flagrant, apparent and widely known violations of the multifamily restriction; Lot 8 of Square 5 and Lot 7 of Square 6. The other violations were more technical, less substantial and not widely known. The lack of knowledge, perhaps, can be partly attributed to the beautiful foliage, the general landscaping and the sense of privacy and seclusion that help make up the charms of that subdivision. A number of the violations are on the perimeter of the subdivision.
We have come to the conclusion that there has been insufficient violations of a substantial nature to evidence abandonment of the plan for the subdivision, a subversion of the original scheme of the subdividers. Proof of acquiescence was insufficient. College Town for all intents and purposes, remains a single family neighborhood.[8]

BUILDING SETBACK AND SIDELINE RESTRICTIONS
Again we disregard any evidence as to violations in Square 1 since we believe *474 the building setback and sideline restrictions were not intended to apply to Lots 7 though 18.
The trial judge considered numerous instances where garages were within 15 feet of the sideline as indicative of abandonment of the 15 feet sideline restrictions as to houses. We note that the restrictions state that "no residence or garage shall be placed nearer than fifteen (15) feet to either sideline of said lot." (Emphasis ours) We do not believe that a proven waiver of the prohibition of garages within 15 feet of the sideline necessarily results in a waiver of the prohibition against houses within 15 feet of the sideline because abandonment, or acquiescence, in the violation of one restriction does not amount to the abandonment of other separate and distinct restrictions. 26 C.J.S. Deeds § 169, at p. 1166; Olivier v. Berggren, 136 So.2d 325 (La.App. 4th Cir. 1962).
Furthermore, the different effect to be given to sideline restrictions violated by insubstantial structures such as garages as opposed to houses has been previously noted by this court. In Melrose Civic Association v. Universal Builders, Inc., 289 So.2d 521 (La.App. 1st Cir. 1973) writ refused, La., 293 So.2d 167 (1974), we held that although carports, boat sheds, storage sheds and other structures insubstantial in nature violated sideline restrictions, such violations did not support waiver of the right to prohibit construction of a house in violation of sideline restrictions. We, therefore, likewise find that although the sideline restrictions as to garages may have been abandoned, such abandonment cannot be used to support an allegation that the sideline restriction as to houses has also been abandoned.
One of plaintiff's witnesses claimed to have personally "stepped off," "eye-balled," or measured with the view finder of his camera, numerous setback, rear line and sideline violations. He admitted that in practically all of the alleged violations he "measured," he either assumed the sidewalk, street pavement, bushes, trees, or fences were the property lines. Because he was not qualified, offered, or accepted by the court as an expert, we are compelled to give most of his "conclusions" and "opinions" very little weight. However, we do note that the pictures offered into evidence in conjunction with his testimony do in fact show several sideline violations in Square 3.[9]
These sideline violations are: Lot 2 (only seven feet from sideline); Lot 4 (only ten feet); Lot 6 (only six feet); Lot 7 (only three feet); and, Lot 20 (only three or four feet).[10] The testimony of R. L. Breaux, an expert land surveyor also established sideline violations at Lots 10, 11 and 12 of Square 7, ranging from houses being only eight to ten feet from the sideline.
We do not consider these violations so substantial as to warrant declaring the sideline restrictions as to Square 7 null and void, much less as to the entire subdivision. Square 3 is located on the perimeter of the subdivision. The other three sideline violations are insubstantial. They do not indicate a subversion of the original scheme of the subdivision or a substantial change in the neighborhood as required by Guyton, supra.
Parker contends that the photograph exhibits show numerous house setback violations. These alleged violations are: Lot 11 of Square 3, set back only twenty-four feet; Lot 1 of Square 6, only seven feet to sidewalk; Lots 7 and 8 of Square 9, set back only twenty-eight feet; Lots 4 and 5 of Square 17, set back only twenty feet; Lot 5 of Square 19, set back only twenty-two *475 feet. We cannot determine by merely viewing the respective photographs that these lots are in violation of the setback restrictions. Nor can we give weight to the "measurements" with respect thereto.
The witness admitted that most of his measurements were from the hard-surfaced edge of the subdivision's streets. He did not attempt to find the iron pipes marking the boundaries of the lots or streets. In addition, he actually went on only two of the lots to make accurate measurements. Because of the degree of certainty required in such measurements, because the photographs do not clearly establish violations and because it was admitted that the measurements could be as much as two feet off, we find these alleged setback violations were not proven by a preponderance of the evidence.[11]
Accordingly, we find that the trial judge erred in finding abandonment of the sideline and setback restrictions.[12]
In view of our disposition of the case, we need not discuss appellee's answer to the appeal praying that the costs be assessed against appellants.
For the above and foregoing reasons there will be judgment herein reversing the lower court and decreeing as follows:
1. That plaintiff's suit be dismissed.

2. That the building restrictions in College Town are in effect and applicable to *476 Lots 1 through 9, Square 7, College Town Subdivision.
3. That there is no dedication existing on Lot 3, Square 7, College Town subdivision.
4. That the judgment in Suit No. 105,944, John S. Garrett and Thomas H. Garrett v. Pelican Realty Co., et al is null and void insofar as it applies to the Coerver heirs.
All costs both in this court and in the lower court are to be borne by the plaintiff.
REVERSED AND RENDERED.
NOTES
[1] Pelican Realty Company and the following other defendants in College Town did not appeal the decision of the lower court: Arlene D. Calcote, Mary Harris, J. E. Clark, Virginia L. Gordon, George Robinson, Inez Robinson, Nancy J. Olive, Gene P. Simard, Sarah S. Simard, Elizabeth J. Carson, A. P. Tugwell, Sr., Xenon, Inc., Walton F. Halphen, Elmer C. Atkinson, Willis D. Morris, Louis E. L. Morris, Willis Dedric Morris, Richard Sanders Morris, Cornelius H. Traweek, Edwin Leland Richardson, Phillip C. Witter, Andrew J. Bullock, Vane Thomas Wilson, James C. Scofield, Nancy B. Scofield, Margaret Henrietta Jackson Carter, Edward B. Robert, L. Clyde Rushworth, Nell E. Rushworth, Marguerite P. Smith, Jessie Mae Gaston Hills, Wade O. Martin, Jr., Florrinell P. Morton, Edwin A. Davis, Tommie Loreece S. Moore, Anna V. Boxhill, Anna Banta, Linnie Jane Sanford, Elma Holmes Summers Champagne, Sylvia Sydney Champagne. As to these defendants, the judgment is therefore final.
[2] In view of our holding, we do not find it necessary to consider the plea of res judicata filed by appellants.
[3] 26 C.J.S. verbo Deeds § 169, p. 1167

"Abandonment in any particular case is a matter to be proved by acts consciously done; a right to object to a particular use of property is not waived in the absence of an intent to waive it; and a person cannot be held to have waived a violation of a restriction where he is not shown to have had knowledge or notice of such violation, or duty to know of it."
[4] Matthews v. Captain, 99 N.J.Eq. 636, 134 A. 359:

"Building containing garage and living rooms, erected in rear of building, violated restriction limiting premises to single family dwellings."
26 C.J.S. verbo Deeds § 164(3), p. 1127:
". . . the rental of a chauffeur's quarters over a garage to an independent family not related to the owner who resides in a single-family dwelling house, has been held to violate a covenant against the erection of any building other than a single-family dwelling house and outhouses necessary and appropriate to the use thereof," citing Kiernan v. Snowden, Sup., 123 N.Y.S.2d 895.
[5] In Cunningham v. Hall, 148 So.2d 808 (La. App. 4th Cir. 1963), it was held that the terms "one dwelling house" or "single houses" in subdivision restrictions prohibited the conversion of a single family home into three separate rental units.
[6] We note in support of this position that the original subdivision plat did not indicate any building lines on Lots 7 through 18 of Square 1.
[7] The residents who were questioned as to lack of objections to apartments in Square 1 testified that while they were not pleased they understood that the restrictions allowed apartments there.
[8] The lower court excluded the expert testimony of Mrs. Eleanor Dent and evidently did not rely on the testimony of the expert witness for plaintiff as to the degradation of the neighborhood. We too find that testimony irrelevant. The lower court, however, was in error in excluding Mrs. Dent's testimony on the ground she was a party to the suit. See Louisiana Power & Light Company, Inc. v. Hendee Homes, Inc., 275 So.2d 894 (La.App. 4th Cir. 1973).
[9] As noted previously, one factor we must consider is that Square 3 is located fartherest from where Parker wants to build.
[10] Each of these violations are perceptible from the photograph exhibits. The measurements are strictly estimates provided by Mr. Lanneau. These are the only violations apparent from the photographs.
[11] The testimony of R. L. Breaux did establish setback violations on Lot 8 of Square 14 (only fifteen feet back) and Lot 10 of Square 7 (only 23.3 feet back). However, we do not feel that these two violations are sufficient to show a waiver of the setback restrictions.
[12] Our review of the jurisprudence indicates that violations of subdivision restrictions have been so numerous and substantial as to indicate a subversion of the original scheme of the subdividers in only two out of eleven instances.

In Edwards v. Wiseman, supra, where 23 out of 28 corner lots in a subdivision violated a restriction as to what street houses must front, the Supreme Court declared that restriction abandoned.
In Finn v. Murphy, 72 So.2d 358 (La.App. Orl.1954), where 9 out of 16 corner lots in a subdivision violated a restriction as to the placement of fences no closer than twenty feet from the sideline, the restriction was declared abandoned.
In all other cases we are aware of, the restriction was not considered as abandoned. In Ouachita Home Site & Realty Co., Inc. v. Collie, 189 La. 521, 179 So. 841 (1938) the evidence was found insufficient to prove that a restriction against commercial use was abandoned.
In Alfortish v. Wagner, 200 La. 198, 7 So. 2d 708 (1942), the court held that the fact that an area was rezoned for commercial use would not have the effect of nullifying the general plan of the original vendor; and that the plan of the neighborhood was not abandoned because the developer erroneously failed to include setback restrictions in six of its seventy lots.
In Plauche v. Albert, 42 So.2d 876 (La.App. 1st Cir. 1949), although 3 out of 9 lots violate setback restrictions for garages and the adjacent area was overwhelmingly commercial, the court refused to declare the restrictions abandoned.
In Sherrouse Realty Co. v. Marine, 46 So.2d 156 (La.App. 2nd Cir. 1950), the evidence was held to be insufficient to prove abandonment of a restriction against commercial use.
In Rhodes v. Foti, 54 So.2d 534 (La.App. Orl.1955), only one minor violation of the restriction against commercial use was not sufficient to show abandonment.
In Guyton v. Yancey, La., 125 So.2d 365 (1960), evidence of 5 violations of eighty feet setback restrictions was deemed insufficient to show a waiver.
In Marquess v. Bamburg, 188 So.2d 721 (La.App. 2nd Cir. 1966), nine violations of the restriction against commercial use out of seventy residences was not substantial enough.
In Fisher v. Smith, 190 So.2d 105 (La.App. 4th Cir. 1966), 39 instances of violation of restriction against erecting fences in front of homes with 900 to 1000 homes in subdivision was not considered numerically sufficient to constitute abandonment.
In Adair v. Chrysler, 212 So.2d 552 (La. App. 2nd Cir. 1968), the erection of a few fences and other minor violations was not considered sufficient for abandonment of restriction against fences in front of minimum setback line.
In Melrose Civic Association v. Universal Builders, Inc., 289 So.2d 521 (La.App. 1st Cir. 1973), 5 to 14 violations out of 279 residences were considered insufficient to declare sideline restrictions abandoned.