LOTTINGER, Judge.
This is an appeal by defendants from a judgment granting a preliminary injunction enjoining them from the practice of public accounting on certain premises located in Krumbhaar Subdivision, Terrebonne Parish.
Plaintiffs,[1] all property owners in Krumbhaar Subdivision, Terrebonne Parish, filed suit to enjoin defendants, Robert E. Kelton and his wife Claudia Gordon Kelton, from the practice of public accounting on Lot One in Block Five of Krumbhaar Subdivision, as a violation of the building restrictions of said subdivision. Plaintiffs contend that the building restrictions restrict the subdivision to residential purposes and business or commercial enterprises are expressly prohibited.[2] The defendant, Robert Kel-ton, stipulated at trial that he owns Lot One in Block Five in Krumbhaar Subdivision and that he practiced public accounting on those premises.
Krumbhaar Subdivision is situated off of Louisiana Highway 311. A railroad track traverses the subdivision as a result of *1241 which four (4) lots are between the railroad track and La. 311, with two lots located on each side of the entrance drive. The subject lot is at the intersection of La. 311 and the entrance drive. (See Appendix “A” for a copy of the plat of Krumbhaar Subdivision).
The subdivision consists of 24 separate lots, thirteen of which are improved. Defendants at the time of trial owned two improved lots in the subdivision. One lot is the Kelton residence, and the other lot is the property that is the subject of the injunction order appealed from herein. On October 25, 1971, the developers of Krumbhaar Subdivision recorded in the public records of Terrebonne Parish a document entitled “Restrictions to Krumbhaar Subdivision.”
Defendants have assigned the following specifications of error:
I. The trial court erred in failing to adequately consider relevant Louisiana law that building restrictions are unenforceable if they have been abandoned by acquiescence or inaction.
II. The trial court erred in failing to hold that the restrictive covenants are no longer in force or effect based on a general abandonment or waiver of the restrictions by other lot owners in the subdivision, including plaintiffs. Alternatively, the trial court erred in failing to hold that the specific restrictions regarding “Residential Use Only” of subdivision property have been abandoned.
III. The “Residential Use Only” sections of the Krumbhaar restrictions are null and void as to Lot 1, Block 5 because that portion of the subdivision plan is not feasible or capable of being preserved as to that particular lot.
IV. The trial court erred in rendering judgment in favor of plaintiffs-appellees in that these particular plaintiffs are not entitled to the extraordinary remedy of injunctive relief. Plaintiffs-appellees themselves have violated the restrictions and do not come to this court with clean hands; furthermore, the enforcement of the restrictions by these plaintiffs was arbitrary and discriminatory in nature, a fact not taken into account by the trial court.
Act 170 of 1977, Regular Session, amended and reenacted Title V of Book II of the Louisiana Civil Code of 1870 to insert articles 775-783 on Building Restrictions.[3] Ar- *1242 tide 780 was subsequently amended by Act 310 of 1980, Regular Session. These Civil Code Articles represent a codification of prior Louisiana jurisprudence. Thus the rules of construction, interpretation and enforcement of building restrictions have not changed merely because of their placement in the Civil Code.
ASSIGNMENT OF ERROR NO. 1
Defendants argue that in granting the injunction the trial judge did not apply the applicable law of building restrictions. They reach this conclusion by reading the trial judge’s written reasons for denying a suspensive appeal. The trial judge has not favored us with written reasons for granting the injunction.
Defendants go astray in their interpretation of the trial judge’s reasons for the denial of a suspensive appeal. It was apparent to this court at the time we declined the exercise of our supervisory jurisdiction and refused to issue a stay order [4] that the trial judge was impressed with the fact that defendants personally knew of the restrictions prior to their purchase of the subject property, and that they had been forewarned by at least two of these plaintiffs that the practice of public accounting would be a violation of the restrictions and injunc-tive relief would be sought to prohibit such practice. For those reasons the trial judge denied a suspensive appeal, but we cannot agree that such gives any indication that the trial judge failed to apply the applicable law on the merits.
ASSIGNMENT OF ERROR NO. 2
Defendants-appellants are basically arguing that the number and nature of past and continuing violations of these building restrictions have resulted in an abandonment of these restrictions within the meaning of La.C.C. art. 782, or that at least the “Residential Use Only” restriction has been abandoned.
In East Parker Properties, Inc. v. Pelican Realty Co., 335 So.2d 466 (La.App. 1st Cir. 1976) writ refused 338 So.2d 699 (La. 1976), Judge Ponder as the organ of this court said:
“Generally, the courts will enforce building restrictions imposed upon land according to the intent of the subdividers, provided they not be against public policy and not be abandoned.
“It is not every violation that will lead to abandonment. We must look to the intention of those imposing and those seeking to continue the building restrictions. Insubstantial, technical or infrequent violations, not subversive of the general plan or scheme, are to be given little effect. “In deciding whether or not restrictions have been abandonment we must first decide what the subdividers intended the plan and scheme of the subdivision to be; then we must inquire into each alleged violation to determine whether the intended plan and scheme are disrupted. It is our conclusion that the restrictions in this case taken as a whole evidence an intent to allow only one family per lot. “Whether there has been acquiescence in violations of subdivision restrictions sufficient to defeat enforcement of the restrictions depends upon the circumstances of each case, including particularly the character, materiality and number of the violations and their proximity to the objecting residents. Guyton v. Yancey, 240 La. 794, 125 So.2d 365 (1960). Generally, where there have been frequent and substantial violations of the restrictions without objection, the restrictions are regarded as having been abandoned. Edwards v. Wiseman, 198 La. 382, 3 So.2d 661 (1941). However, for this rule to be applicable, the property owner against whom abandonment is asserted, must have known of the alleged violations or have had a duty to know. Also, there is no abandonment of subdivision restrictions unless violations have been such that there has been a subversion of the original scheme of the subdividers, resulting in a substantial change in the intended nature of the subdivision. Guyton, supra, Marquess v. Bamburg, La.App., 188 So.2d 721, Adair v. Chrysler, La.App., *1243 212 So.2d 552. See also Plauche v. Albert, La.App., 42 So.2d 876. Melrose Civic Association v. Universal Builders, Inc., 289 So.2d 521 (La.App. 1st Cir. 1973), writ refused, La., 293 So.2d 167 (1974).” (Footnotes omitted).
Defendants-appellants contend that violations of the building restrictions have occurred in the areas of minimum sideline and rear line setbacks, business or commercial activities, accessory buildings, commercial vehicles parking in the subdivision, mobile homes as residences, minimum lot sizes, use of used material and metal roofs in construction, fences between the sill and the front lot line, and unkept vacant lots.
SIDELINE AND REAR LINE VIOLATIONS
The building restrictions require that “no residence shall be erected * * * nearer than ten (100 feet of any sideline * * *.”[5] From a close examination of the record we find only two violations of the sideline restriction. The houses owned by Eldon Freeman and Dr. Merrick Dugal, which share a common sideline, are both in violation of the restriction. Both houses are closer than 10 feet to the sideline.
Defendants complain that the house owned by Mr. and Mrs. Norman J. Claverie is within three to five feet of the side lot line. However, the evidence points out the Claveries own two lots, thus their house is more than 10 feet from the sideline which is common with their neighbor.
Plaintiff Tracy Rhodes owns a greenhouse which is conceivably nearer than 10 feet to the rear lot line and in violation of the restrictions. However, the restrictions as to rear property lines states that “no residence, carport, garage or other permitted accessory building shall be located nearer than ten (10') feet to the rear property line.” The restrictions also provide that accessory buildings must be constructed with the same materials that compose the main building.[6]
We are of the opinion that the developers never intended to prohibit a greenhouse from being nearer than 10 feet to the rear property line. We reach this conclusion because only residences, carports, garages or other permitted accessory buildings are mentioned in this particular restriction. A greenhouse is obviously not a residence carport or garage. If it is covered at all it must fall within the general category of accessory building. However, the only allowable accessory building is one built out of the same materials as the main structure. We dare say that a greenhouse would not serve its purpose if it it were constructed out of the same materials as the main structure, i. e. bricks, wood siding, and normal roofing. Thus we conclude greenhouses do not fall within the classification of accessory buildings and therefore are not covered by the restriction.
Of the 24 lots in the subdivision only two are in violation of the sideline or rear line restriction.
COMMERCIAL VEHICLES
The restrictions provide that “the streets of the subdivision are primarily for the benefit of the residents thereof, and no person may use the same for the purpose of parking commercial vehicles or semi-commercial vehicles or old automobiles.” Defendants complain generally of several vehicles with commercial license plates being parked in the subdivision. These vehicles are either owned by residents of the subdivision, yet carry commercial plates, or are owned by the resident’s employer and are for the use of the resident. We do not find that the parking of a vehicle with a commercial *1244 license plate violates the intention of this particular restriction.
MOBILE HOME
The defendants also complain that during the construction of the Claveries’ home they parked a recreational vehicle on their property, and conceivably lived in same for a short period of time. It is unclear from the record whether anyone actually resided in this recreational vehicle, but conceding ar-guendo that someone did reside in this recreational vehicle for several months, such would only be a technical violation, but would not be enough to void this particular restriction.
MINIMUM LOT SIZE
Defendants also complain that plaintiff Jerry Schwab purchased a strip of land from a neighboring lot which would cause the neighboring lot to fall below the minimum site size of 10,000 square feet. We find insufficient proof in the record that such lot would fall below 10,000 square feet, but be that as it may, it is not a violation of the building restrictions until someone attempts to construct a dwelling on a site having an area of less than 10,000 square feet.
USED MATERIALS
The building restrictions provide that all residences shall be constructed of new material and that no metal or aluminum type roof of any kind may be used. In the home of Robert L. and Laura Herring Morris, heart pine flooring was used in certain areas, as well as a small copper roof over a bay window. The heart pine flooring was purchased as antique flooring, and we cannot conceive any intention on the part of the developers of prohibiting the use of antique wood flooring in a new structure. The small copper roof was classified by Mrs. Morris as flashing rather than a roof. We venture to say that the developers intended more to prohibit a metal roof on the main roof of the structure rather than a small roof covering a bay window. Thus we find no violation.
UNKEPT LOTS
The restrictions provide that “the developer of Krumbhaar Subdivision shall have the right to cut grass upon any vacant or unimproved lots whenever it deems necessary and the owner thereof shall be assessed a charge of $10.00 for each cutting per lot.” The defendants complain that all of the unimproved lots (11 lots were unimproved) were in unkept condition, and thus amounted to a violation of the building restrictions sufficient enough to void the entire scheme or plan of the building restrictions. Though this particular restriction is part and parcel of the document which contains the building restrictions to Krumbhaar Subdivision, it is more in the nature of a right granted to the developer to cut the grass on vacant lots and charge the owner, rather than a restriction which can be enforced by a fellow land owner in the subdivision. But be that as it may, we do not agree that the failure to cut grass on 11 unimproved lots would void the general scheme or plan for the subdivision.
FENCES
Appellants contend that fences were constructed in violation of the restrictions on property owned by John Saia (Lots 1 and 2 of Block 4) and Tracy Rhodes. The restriction in question provides that “fences shall not be erected between the front lot line and the front sill line of the main building.”
As to the property of Mr. Rhodes, we understand this alleged fence to be nothing more than a boundary marker in the nature of a chain wall some three or four bricks high. Though this low wall does exist between the front lot line and the front sill, this is not a fence as contemplated by the restriction, and thus not a violation.
The two lots owned by Mr. Saia are unimproved. We pretermit any determination of whether a fence enclosing the boundaries of these two lots constitute a violation in as much as the prescriptive period may not have run, Mr. Saia is not a party to these proceedings, and this issue, as such, is not presented to us for determination.
*1245 BUSINESS ACTIVITIES
In addition to the above alleged violations of the building restrictions, defendants-appellants also allege certain activities which are violative of the non-business or noncommercial building restrictions.
It is alleged that Eldon Freeman conducts a business from his home. Mr. Freeman is the manager of an oilfield service company. This service company has an office and shop some distance from this subdivision. In his home he has five telephone lines. Two are personal lines and three are business lines. Of the three business lines one is a regular business number, one is an in wats, and the third is a direct line to Rayne, Louisiana, where the company also has a shop. We gather from the record that the same three lines would also be present in the company office as well as in the home of Mr. Freeman’s sister. The business is a family owned business and the sister participates therein.
Mr. Freeman explained that he is on 24 hour call, and when a call comes in at any hour of the day or night from a customer, he must be available to tend to that business. Additionally, company trucks have gone to his home to deliver papers as well as pick up pay checks. We do not find that any of the activities engaged in by Mr. Freeman constitute a business or commercial enterprise in violation of the building restrictions.
Plaintiff Dr. Merrick Dugal is a dentist, and several years ago attempted to depreciate a part of his house on his income tax return because he did his own bookkeeping at his home at night and on the weekends. This too is not the type of business or commercial activity which the developers sought to prohibit. There is other evidence in the record that professional people living in this subdivision receive telephone calls from clients at their homes, as well as taking work home from the office at night. This too does not constitute a violation of the building restrictions. If the fact that an individual who is in business receives a telephone call from a client or a customer at his home constitutes the doing of business in a subdivision, then we would venture to say that no one would be able to live in a subdivision where business or commercial activities are prohibited. It is obvious to this court, as it should have been obvious to the defendants, that this is not the type of activity that was sought to be prohibited.
Mr. Louis Gueniot, a resident and homeowner in the subdivision, is in the supermarket and catering business. He testified that during one Christmas season because of an error in his catering business, certain food items had not been prepared on several occasions, and it was necessary that he and his wife prepare those items in his home kitchen. Though those few occasions might be technical violations of the non-business or commercial activity provision, they are insubstantial and not subversive of the building restriction and will be given little effect. The other plaintiffs testified that they did not know this in-home cooking had taken place.
Taken as a whole, we do not find that any of the alleged violations constitute an abandonment or a waiver of the general scheme or plan as conceived by the developers. Nor do we find those alleged business or commercial violations to be anywhere near sufficient to constitute a waiver or abandonment of that particular restriction.
ASSIGNMENT OF ERROR NO. 3
Defendants-appellants argue that because the subject lot is adjacent to Louisiana Highway 311 and that commercial establishments directly abut the property, the subject lot is unsuitable for residential purposes, and, therefore, the plan of Krumb-haar Subdivision is not feasible or capable of being preserved with respect to that lot, citing La.C.C. art. 775.
It is clear from the record that commercial establishments front Louisiana Highway 311 near and even next to the subject lot. However, it is also clear that a residence is situated on a piece of property fronting Louisiana Highway 311 in close proximity to the subject property. The point is that this is apparently an area of mixed commercial and residential property. *1246 The highest and best use of the highway frontage would be for commercial development. However, where such property is burdened with restrictions prohibiting such use, then the highest and best use must be residential.
What defendants-appellants in essence are asking the courts to do is free this lot of the residential restriction because of its proximity to a highway. Appellants cite La.C.C. art. 752 in conjunction with Article 775 for the proposition that if the lot in question has undergone such a change that the restriction can no longer be useful, then the restriction must be voided.
Article 775 speaks of building restrictions and a “general plan.” That article also provides that “the plan must be feasible and capable of being preserved.” The word “plan” in the last sentence of Article 775 refers to the terminology “general plan” as found in that article. The entire general plan must be feasible and capable of being preserved, not merely a small part of the general plan. There are 24 lots in Krumbh-aar Subdivision, and defendants claim that one lot should be released from the general plan because of surrounding commercialization. This is not what Article 775 has reference to. Either the general plan fails or it succeeds, not merely a part thereof.
Additionally, appellants’ argument as to Article 752 has no merit. Article 752 provides:
“If the exercise of the servitude becomes impossible because the things necessary for its exercise have undergone such a change that the servitude can no longer be used, the servitude is not extinguished; it resumes its effect when things are reestablished so that they may again be used unless prescription has accrued.”
Appellants attempt to engraft Article 752 onto the building restriction articles because Article 777 in part provides that the “building restrictions * * * are regulated by application of the rules governing predial servitudes to the extent that their application is compatible with the nature of building restrictions.” We find the application of Article 752 is not compatible. Article 752 speaks of a temporary release from a servitude and the reestablishment thereof. However, in the instant case once the subject lot would be released from the building restriction prohibiting business and commercial activities, that restriction could never be re-established. We dare say that this is not what Article 752 had in mind.
ASSIGNMENT OF ERROR NO. 4
The defendants-appellants argue that plaintiffs do not come into court seeking equity with clean hands. The basis of the argument is that several plaintiffs violated the building restrictions in question, and each of the plaintiffs knew or should have known of other violations in the subdivision, but none of the plaintiffs took any action to halt such violations.
As we have noted above, only two of the plaintiffs, Dugal and Freeman are technically in violation of any of the restrictions. The fact that two of the plaintiffs are in violation of one of the restrictions certainly does not restrict the availability of an injunction proceeding to the other plaintiffs. As to the argument that plaintiffs either knew or should have known of the violations, we find no merit. Where a property owner has violated a building restriction, he will not be precluded from enforcing a more important or substantial violation against another property owner. Guyton v. Yancey, supra. We venture to say that as regards a residential subdivision, one of the most important building restrictions is that which restricts the use of the property for residential purposes. A violation of that restriction vis-a-vis the violation of a sideline restriction is certainly more important and substantial.
Therefore, for the above and foregoing reasons, the judgment of the trial court is affirmed at defendants-appellants’ costs.
AFFIRMED.

. The plaintiffs and the property they own are Jerry H. Schwab — Lot 4 and part of Lot 5 of Block 3; Robert L. Morris and Laura Herring Morris — Lot 1 of Block 1; Merrick A. Dugal, Jr. — Lot 3 of Block 3; Norman J. Claverie and Beulah Giroir King Claverie — Lots 1 and 2 of Block 1; and Tracy L. Rhodes — Lot 3 of Block 2.

. The restrictions in part provide:
3.All lots of this subdivision shall be used for single family residential purposes.
******
11. There shall be no noxious or offensive trade or other activities carried on or engaged in upon any lots, or shall anything be done thereon which may be or become an annoyance or nuisance to the subdivision; nor shall there be erected, established, maintained, operated or carried on any business or commercial enterprise of any kind whatsoever, private or public.

. Art. 775. Building restrictions. Building restrictions are charges imposed by the owner of an immovable in pursuance of a general plan governing building standards, specified uses, and improvements. The plan must be feasible and capable of being preserved.
Art. 776. Establishment. Building restrictions may be established only by juridical act executed by the owner of an immovable or by all the owners of the affected immovables.
Art. 777. Nature and Regulation. Building restrictions are incorporeal immovables and real rights likened to predial servitudes. They are regulated by application of the rules governing predial servitudes to the extent that their application is compatible with the nature of building restrictions.
Art. 778. Affirmative duties. Building restrictions may impose on owners of immovables affirmative duties that are reasonable and necessary for the maintenance of the general plan. Art. 779. Injunctive relief. Building restrictions may be enforced by mandatory and prohibitory injunctions without regard to the limitations of Article 3601 of the Code of Civil Procedure.
Art. 780. Termination according to title; agreement of owners. Building restrictions terminate as provided in the act that establishes them. In the absence of such provision, owners representing more than one-half of the land area, excluding streets and their rights-of-way, affected by the restrictions may amend or terminate by agreement, for the whole or a part of the restricted area, building restrictions that have been in effect for at least fifteen years. Art. 781. Termination; liberative prescription. No action for injunction or for damages on account of the violation of a building restriction may be brought after two years from the commencement of a noticeable violation. After the lapse of this period, the immovable on which the violation occurred is freed of the restriction that has been violated.
Art. 782. Abandonment of plan or of restriction. Building restrictions terminate by abandonment of the whole plan or by a general abandonment of a particular restriction. When the entire plan is abandoned the affected area is freed of all restrictions; when a particular restriction is abandoned, the affected area is freed of that restriction only.
Art. 783. Matters of interpretation. Doubt as to the existence, validity, or extent of building restrictions is resolved in favor of the unrestricted use of the immovable.

. Schwab v. Kelton, 399 So.2d 624 (La.App. 1st Cir. 1981), writ denied 396 So.2d 944 (1981).

. The restrictions provide:
“No residence, carport, garage, or other permitted accessory building shall be located nearer than ten (10') feet to the rear property line. For the purpose of this covenant eves [sic], steps and open porches shall not be considered as part of the building.”

. The restriction provides:
“10. No accessory buildings shall be permitted unless the same are constructed of identical materials in the construction of the main structure, are not less than 144 square feet in area and are situated within (10') feet of the rear lot line.”